520 A.2d 402

**Theresa M. CHENEY**

v.

**BELL NATIONAL LIFE INSURANCE COMPANY.**

**No. 842, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Feb. 4, 1987.

**164**

Joseph A. Miklasz, Glen Burnie, for appellant.

Ira L. Oring (George F. Pappas and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A. on brief), Baltimore, for appellee.

Argued Before GILBERT, C.J., and WEANT, and GARRITY, JJ.

GILBERT, Chief Judge.

Twenty-four year old Anthony C. Cheney died as a result of receiving a blood transfusion. Unfortunately, the blood contained the dreaded Acquired Immune Deficiency Syndrome virus (AIDS).[1] His surviving spouse, Theresa M. Cheney, made claim under an accidental death insurance policy issued by Bell National Life Insurance Company ("Bell"). Bell refused payment on the ground that Mr.

---

1. AIDS is a

> "profound, irreversible immune dysfunction that is caused when [a particular virus] infects the ... special white blood cells.... As the body's immune system is impaired, opportunistic infections and/or rare malignancies continue to weaken the body until death occurs. While more experimental drug therapies are being evaluated ...[,] AIDS appears to be invariably fatal."

Governor's Task Force on Acquired Immune Deficiency Syndrome, *AIDS and Maryland, Policy Guidelines and Recommendations* 4 (Dec. 1986).

Cheney's demise was not occasioned by accidental means. Rather, Bell asserted that Mr. Cheney's death, even if an accident, resulted from a cause that was specifically excluded from policy coverage. Patently dissatisfied with that explanation, Mrs. Cheney filed suit in the Circuit Court for Baltimore City against Bell, which answered and, after obtaining Mrs. Cheney's response to interrogatories, moved for summary judgment. Judge Elsbeth L. Bothe granted Bell's motion and entered judgment in its favor. Obviously because of what she views as a suboptimal result, Mrs. Cheney has appealed.

### The Facts

Mr. Cheney was a hemophiliac and from July 1980 until the time of his death was under the care of the Hemotology Clinic at St. Agnes Hospital in Baltimore City. Each month Mr. Cheney "received transfusions of several vials of factor 8 concentrate, which is a blood product replacement." Also in 1980 the Cheneys purchased a home. At that time they acquired a mortgage from Standard Federal Savings and Loan Association and a group accident policy from Bell. The policy provided that in the event of the accidental death of either Anthony or Theresa Cheney, Bell would pay the then "outstanding balance" of the mortgage.

On December 11, 1982, Mr. Cheney was admitted to St. Agnes Hospital because of shortness of breath. His condition worsened progressively, and he expired on December 23, 1982. Death was attributed to pneumocystis carinii pneumonia, an infection of the lungs. The infection "developed as a result of Mr. Cheney's contraction of . . . (AIDS)" which in turn developed from "the medical treatment of his hemophilia with factor 8 concentrate." In short, the transfusions necessitated by the hemophilia led to Mr. Cheney's contracting AIDS.[2]

---

2. The incubation period for AIDS "may be two and one-half to five years or more. Indeed some researchers believe that there is no real maximum incubation period—that is, an infected person may develop

The record reveals that Dr. Emile R. Mohler Jr., Chief, Section of Hemotology, St. Agnes Hospital, wrote to appellant's counsel in January 1985: "At the time [of the transfusion of Mr. Cheney] it was not possible ... to test or examine blood and blood products such as blood factor concentrate to determine the absence of AIDS causative factor...."

Bell's policy, as issued to the Cheneys, provided in pertinent part:

"The policy does not apply to any loss, fatal or non-fatal, caused by or resulting from:

. . . .

(2) sickness or disease or medical or surgical treatment therefore except pyogenic infection which shall occur through an accidental cut or wound...."

## The Issue

Despite the manner in which Mrs. Cheney phrases the issue before us, the overriding question is: Was there a genuine dispute of a material fact so as to preclude entry of summary judgment in favor of Bell?

## The Law

Md. Rule 2–501 permits a judge of a circuit court to direct the entry of judgment "in favor of or against" a movant "if the pleadings, ... answers to interrogatories, admissions, and affidavits show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law."

The purpose of Rule 2–501 is to prevent the unnecessary expenditure of time and money in preparing for trial when there is no genuine dispute of material facts, and the moving party is entitled to judgment as a matter of law.

symptoms at any time during his or her life." National Institute of Justice, Issues and Practices, Theodore M. Hammett, *AIDS in Correctional Facilities: Issues and Options* 6 (U.S. Dept. of Justice, Apr.1986).

*Whitcomb v. Horman,* 244 Md. 431, 224 A.2d 120 (1966); *Robertson v. Shell Oil Co.,* 34 Md.App. 399, 367 A.2d 962 (1977).

With the rule and its purpose in mind, we examine the pleadings, answers to interrogatories, and affidavits in the instant case.

It is beyond question that Mr. Cheney died, at least indirectly, as a result of his contracting AIDS.[3] He contracted AIDS from blood transfusions. The transfusions were administered to combat Mr. Cheney's hemophilia. The transfusions were prescribed medical treatment for hemophilia. Therefore, the treatment for hemophilia led to the disease that ultimately caused Mr. Cheney's death. Consequently, Mr. Cheney's tragic demise was not within the ambit of the policy. It was, instead, the result of a cause that was specifically excluded from the policy.

Although Mrs. Cheney recognizes the cause of death, she argues that the death was "accidental" (the "accident" being the drawing of blood from a donor who had AIDS and infusing it into Mr. Cheney). Mrs. Cheney's argument falls short in that the receiving of the blood from an infected donor was not an accident. It was purposely drawn from the donor and infused into the deceased. No test was then available to the hospital to determine whether evidence of AIDS was present in blood or blood products. AIDS was not even recognized in this country until June 1981, Governor's Task Force on Acquired Immune Deficiency Syndrome, *AIDS and Maryland, Policy Guidelines and Recommendations* 4 (Dec.1986).[4] Thus it was not until approx-

---

**3.** "AIDS is a uniformly lethal disease. 90 percent of the patients diagnosed prior to 1982 have died: almost one-third of those diagnosed with AIDS within the first six months of 1986 have died." Governor's Task Force on Acquired Immune Deficiency Syndrome, *AIDS and Maryland, Policy Guidelines and Recommendations* 5 (Dec. 1986).

**4.** As of October 31, 1986, 426 AIDS cases were reported in Maryland; 140 were diagnosed after January 1, 1986. Of the total number of

imately one year after Mr. Cheney began his monthly transfusions of blood "factor 8 concentrate" that the first case of AIDS in the United States was acknowledged.[5] Furthermore, the test to determine the presence of AIDS antibodies was not licensed until early 1985, over two years after Mr. Cheney's demise.[6]

To circumvent the language of the policy, Mrs. Cheney contends that hemophilia is not a disease but a "condition." To bolster her position, she refers us to a single authority: *Dorland's Illustrated Medical Dictionary*, 373, 595 (26th ed. 1981). There it is said:

> "hemophilia—a hereditary hemmorrhagic diathesis due to deficiency of coagulation Factor VIII, and characterized by spontaneous or traumatic subcutaneous and intramuscular hemorrhages; bleeding from the mouth, gums, lips, and tongues; hematuria; and hemarthroses. It affects males, being transmitted as an x-linked recessive trait."

"Diathesis" is defined by Dorland as "a constitution or condition of the body which makes the tissues react in special ways to certain extrinsic stimuli and thus tends to make the person more than usually susceptible to certain diseases." According to Dorland, "hemorrhagic diathesis" is "a predisposition to abnormal hemostasis." From those three definitions quoted from one medical dictionary, Mrs.

---

reported cases, one percent appeared in persons with hemophilia and one percent in transfusion recipients. Governor's Task Force on Acquired Immune Deficiency Syndrome, *AIDS and Maryland, Policy Guidelines and Recommendations* 5, 7 (Dec.1986).

**5.** *Id.* at 4.

**6.** The test "does not detect the presence of the virus itself—only the presence of antibodies to the virus.... A positive result on the ... test means that the individual was infected at some time in the past. However, the test cannot pinpoint the date of infection or even determine whether the individual remains infected." National Institute of Justice, Issues and Practices, Theodore M. Hammett, *AIDS in Correctional Facilities: Issues and Options* 3 (U.S. Dept. of Justice, Apr. 1986).

Cheney deduces that "hemophilia" is not a "sickness or disease but ... a genetically transmitted trait...."

We do not propose to enter into a battle of dictionaries, but we observe that *Stedman's Medical Dictionary* 636 (24th ed. 1982) refers to hemophilia, among other things, as "a disorder" and as "Christmas disease."

Irrespective of whether hemophilia is a disorder, disease, sickness, or condition, Mr. Cheney's death was attributed to pneumonia. That illness was in turn the result of AIDS. Since AIDS and pneumonia are diseases,[7] death was caused by a disease.

Because we think Mr. Cheney's death was not accidental within the meaning of the policy, we conclude that there was no genuine dispute of a material fact in the case *sub judice* and that summary judgment as a matter of law was properly entered in favor of Bell National Life Insurance Company.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

**7.** AIDS is recognized by statute in Maryland as a "disease." Md. Health General Code Ann. § 18–333. "By law, AIDS is a reportable disease, in all 50 states." Governor's Task Force on Acquired Immune Deficiency Syndrome, *AIDS and Maryland, Policy Guidelines and Recommendations* 4 (Dec.1986).